Estate of Mrs. Sarah H. Bradley, Columbus Bank & Trust Co., W. C. Bradley, and Mrs. Elizabeth Bradley Turner, Executors v. Commissioner.
Estate of Bradley v. Commissioner
Docket No. 106452.
United States Tax Court
1943 Tax Ct. Memo LEXIS 163; 2 T.C.M. (CCH) 609; T.C.M. (RIA) 43382; August 6, 1943
*163 John E. McClure, Esq., and J. Q. Davidson, Esq., Murrah Bldg., Columbus, Ga., for the petitioners. F. L. Van Haaften, Esq., and Francis T. Donahoe, Esq., for respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in the estate tax on the estate of Mrs. Sarah H. Bradley in the amount of $690,697.53. The petitioners claim an overpayment. The issues, briefly stated, are the following: 1. What was the value on December 30, 1936 of 1,563 shares of the common capital stock of the W. C. Bradley Co. ? In the estate tax return, the petitioners valued the stock of the W. C. Bradley Co. held by decedent at the time of her death at $200 per share. The respondent determined its value, originally, to be $300. By virtue of amendments to their pleadings, the petitioners now take the position that the evidence adduced at the hearing showed the value of the stock to be $121 per share, while the respondent now contends that the correct value of such stock is $430 per share. 2. Should 1,250 shares of Coca-Cola International Corporation common stock, and 5,000 shares of Bibb Manufacturing Co. common stock, transferred by decedent to D. A. Turner in 1932, *164 be included in the gross estate of decedent, and, if so, at what value? 3. Are the funeral expenses of decedent, in the amount of $2,200.21, deductible from the gross estate? 4. What amount is deductible for attorneys' fees and expenses. Findings of Fact The estate tax return herein was filed with the collector of internal revenue for the district of Georgia. Certain facts were stipulated, and they are hereby found to be as stipulated, and the pertinent parts thereof are hereinafter set forth, together with other facts found from other evidence introduced herein. ISSUE NO. 1. Decedent died at Columbus, Ga., on December 30, 1936. At the time of her death she was the owner of 1,563 shares of the common stock of the W. C. Bradley Co. The W. C. Bradley Co. is a closed corporation, founded in 1897 by decedent's husband, the capital stock of which, consisting of 25,000 shares outstanding, is all held by or for members of the Bradley family. It is not listed, and no sales have ever been made outside of the family group, within which it was given a "nominal" value of $200. The business of the corporation consisted of the owning and operating of cotton warehouses, storing 50,000 *165 to 90,000 bales of cotton per season, the manufacture of 3,500 to 4,000 tons of fertilizer each season, the owning and renting of improved city real estate, owning and operating farm lands totaling 19,160.63 acres, owning stock in "controlled" corporations approximately as follows: 13,344 shares of common and 165 shares of preferred stock in Eagle and Phenix Mills; 7,300 shares of common stock of Bradley Manufacturing Co.; 1,000 shares of common stock of Columbus Grocery and Supply Co. shares of common stock in the Columbus Iron Works Co.; and 2,000 shares of common stock in the Columbus Manufacturing Co.; and stocks in corporations not controlled as follows: 1,600 shares of Coca-Cola common, 7,300 shares of Coca-Cola International common, and 12,000 shares of Bibb Manufacturing Co. common. The condensed balance sheet of the W. C. Bradley Co., as of December 30, 1936, is as follows: W. C. BRADLEY COMPANY
Balance Sheet
December 31, 1936
Assets
Cash on hand and in bank
$ 13,000.04
Notes Receivable
Demand loans on cotton
$531,311.32
Loans secured by stocks
57,852.45
Loans secured by real estate
25,500.00
Notes for advances
36,657.19
$ 651,320.96
Accounts Receivable
16,829.63
Accrued accounts, Storage
Interest, Insurance, Rents, Freight
34,904.09
703,054.68
Inventories: Fertilizer and Materials
64,511.83
Farm supplies
25,479.20
19 B/Cotton
1,001.18
Merchandise
470.02
91,462.23
Investments: Stocks owned at Cost
4,761,235.61
Rental Property Land
283,528.97
Buildings
570,007.96
Machinery
1,000.00
571,007.96
Less: Reserve for Depreciation
99,480.90
471,527.06
5,516,291.64
Permanent Assets: Lands
Warehouse
25,000.00
Fertz. [Fertilizer]
5,000.00
Farms
197,682.35
227,682.35
Buildings
Warehouse
185,201.24
Fertz.
33,983.82
Farms
154,508.41
373,693.47
Machinery and Equipment
Warehouse
1,362.22
Fertz.
8,937.33
Farms
24,869.18
35,168.73
Trucks, Tractors and Autos
Warehouse
2,012.78
Farms
4,351.37
6,364.15
Pipe Lines
Fertz.
6,436.70
Farms
4,815.73
11,252.43
Fences - Farms
30,843.28
Livestock (Mules) - Farms
27,827.30
Wells - Farms
24,748.44
Bridges and Culverts - Farms
5,550.00
Side Track - Warehouse
5,080.48
520,528.28
Less Reserve for
Prepaid - Insurance and Interest
209,239.16
311,289.12
Deferred -
(Fertilizer Operations)
11,678.58
(Out of Season Operations)
1,567.77
$6,876,026.41
Liabilities
Notes Payable
First National Bank, Atlanta, Ga.
$ 191,318.40
Citizens Sou. Nat. Bank, Atlanta, Ga.
95,659.20
National City Bank, New York
95,659.20
Guaranty Trust Company, New York
57,395.60
Columbus Bank & Trust Co., Columbus, Ga.
57,395.60
W. C. Bradley
100,000.00
Others
23,850.00
$ 621,278.00
Columbus Bank & Trust Co., Columbus, Ga.
Rediscounts
Columbus Bank & Trust Co., Columbus, Ga.
310,024.33
Due Stockholders and Customers
87,871.13
Reserves
Income Tax
26,439.04
Social Security
542.42
Bad Accounts
1,514.86
24,496.32
Accrued Accounts
Capital Stock Tax
1,500.00
Interest
640.52
Insurance
390.00
2,530.52
1,050,200.30
Capital Stock
Authorized
5,000,000.00
Unissued
2,500,000.00
2,500,000.00
Surplus
2,500,000.00
Undivided Profits
656,647.34
Profits Sept. 1/36 to Dec. 31/36
169,178.77
$6,876,026.41
*166 The corporate stocks were carried on the books at cost, or market value on the date of acquisition, and had appreciated in value at the date of the decedent's death in an amount of $4,919,969.39. The farm properties are shown on the balance sheet at an appraised value as of 1931, cost figures being unavailable, less depreciation of depreciable items to December 31, 1936. No different value was contended for by either party as the fair market value of the farm property at decedent's death, and none was proved. The W. C. Bradley Co. had contingent liabilities not reflected on the balance sheet, for which no reserve had been set up, in the amount of $1,460.788.02, resulting from its endorsement of notes of Eagle & Phenix Mills in the amount of $1,167,119.02, and of the Columbus Iron Works in the amount of $293,669.00. The net earnings or losses, after provision for taxes, of the W. C. Bradley Co. for the period from 1930 through 1936 were as follows: 1930
$ 36,425.64
loss
1931
23,237.31
loss
1932
32,015.58
loss
1933
50,888.79
1934
31,986.98
1935
111,790.95
1936
466,412.16
Included in the earnings of the W. C. Bradley Co. during those years were dividends on stock *167 of controlled corporations as follows: 1930
Eagle & Phenix Mills
$ 1,830.00
Columbus Grocery & Supply Co.
9,940.00
Columbus Manufacturing Co.
6,865.50
1931
Eagle & Phenix Mills
1,830.00
1932
Eagle & Phenix Mills
1,830.00
1933
Eagle & Phenix Mills
1,380.00
1934
Columbus Mfg. Co.
11,000.00
Columbus Groc. & Supply Co.
7,455.00
1935
Columbus Mfg. Co.
12,000.00
Columbus Groc. & Supply Co.
9,940.00
1936
Columbus Mfg. Co.
2,000.00
Columbus Groc. & Supply Co.
98,857.67 and dividends from corporations not wholly controlled as follows: 1930
Coca-Cola Co.
$ 2,000.00
Bibb Mfg. Co.
20,004.00
Coca-Cola International
101.32
1931
Coca-Cola Co.
3,046.27
Bibb Mfg. Co.
20,004.00
Coca-Cola International
475.32
White Motor Co.
1,000.00
1932
Coca-Cola Co.
4,050.00
Bibb Mfg. Co.
20,004.00
Coca-Cola International
543.32
Coca-Cola Syndicate
11,447.53
1933
Coca-Cola Co.
2,800.00
Bibb Mfg. Co.
4,565.25
Coca-Cola International
476.00
1934
Coca-Cola Co.
2,400.00
Bibb Mfg. Co.
3,660.00
Coca-Cola International
408.00
1935
Coca-Cola Co.
3,200.00
Bibb Mfg. Co.
39,540.00
Coca-Cola International
60,544.00
1936
Coca-Cola Co.
4,400.00
Bibb Mfg. Co.
60,158.00
Coca-Cola International
152,757.60
*168 The extent of the W. C. Bradley Company's ownership of the stock of the so-called controlled corporation is as follows: Percent
Eagle & Phenix Mills
66.71
Bradley Manufacturing Co.
97.58 2/3
Columbus Iron Works
44.76
Columbus Groc. & Supp. Co.
100
Columbus Manufacturing Co.
14.2857
The net profits or losses of these corporations from 1930 to 1936, inclusive, were as follows: Eagle &
Bradley
Col. Iron
Col. Groc.
Col. Mfg.
Phenix Mills
Mfg. Co.
Wks.
& Supp.
Co.
1930
($443,611.40)
($40,276.62)
($ 31,587.90)
$ 6,659.71 ($396,471.17)
1931
( 95,910.86)
( 78,423.28)
( 107,903.84)
( 7,361.92)
( 69,823.53)
1932
26,472.64 ( 77,031.29)
( 119,784.08)
( 1,562.05)
( 66,918.21)
1933
51,906.37 52,169.08 52,065.07 8,064.92 36,605.86 1934
( 148,545.35)
18,549.67 5,353.31 18,700.21 305,241.67 1935
( 239,194.79)
( 40,777.96)
5,222.63 16,922.18 ( 64,531.17)
1936
( 52,562.04)
( 16,151.02)
11,274.58 15,551.31 57,663.09 No dividends were paid by W. C. Bradley Co. to its stockholders during the period from 1930 to 1937, except a stock dividend of $100,000 paid on December 22, 1934. Mr. Bradley had been in business *169 in Columbus for more than fifty years at the time of Mrs. Bradley's death. For some years, his company was engaged solely in a credit and supply and warehouse business, advancing to farmers and cotton growers money which it, in turn, had borrowed from a bank. When the cotton was sold in the fall, the loans were discharged. The nature of the business required the use of extensive credit, which Mr. Bradley was able to command by reason of his known integrity and business ability. About 1914, with the advent of the boll weevil into that section of the south, Mr. Bradley decided he should diversify his business interests, and thereafter the W. C. Bradley Co. invested in cotton mill stocks, real estate, and in the organization of the Coca-Cola Co. Until during the period in question here, the W. C. Bradley Co., and companies in which it held controlling interests, employed about 5,000 people in the city of Columbus and environs. Mr. Bradley was the real managing head of all of these companies, and was so cognizant of his responsibility to the community that he sometimes caused the operation of the plants in spite of temporary pecuniary losses, rather than to shut them down with the consequent *170 loss of employment to so large a section of the community. During the depression, Mr. Bradley pledged his own personal credit for obligations of the W. C. Bradley Co. and certain of the controlled companies. The trend of the earnings of the W. C. Bradley Co., and of its controlled companies, was definitely on the upgrade at the time of the decedent's death. The shares here under consideration were a small minority, slightly over six percent, of the total outstanding shares of the company. The common stock of the W. C. Bradley Co. held by decedent at the time of her death had a fair market value of $429,825, or $275 per share. ISSUE NO. 2. The law of Georgia provides that a married woman may not bind her separate estate by any contract of suretyship nor by any assumption of the debts of her husband. In May of 1932, Mr. Bradley found himself in financial difficulty. He personally owed considerable sums, in excess of one million dollars, to New York and Savannah banks, some of which loans were secured by Coca-Cola International stocks. In addition, the Eagle and Phenix Mills, Columbus Iron Works, and W. C. Bradley Co. owed large amounts on demand on short term notes, endorsed *171 by Mr. Bradley personally. These obligations totaled about $3,050,000. Some of the banks held collateral security, but all were, early in 1932, beginning to be importunate in their demands for payment. One of the banks, the National City Bank of New York, which held no collateral, became most insistent that adequate security be forthcoming. Since most of Mr. Bradley's own available resources were pledged with other banks, it was ultimately decided, after conference between representatives of Mr. Bradley and of the National City Bank, that Mrs. Bradley might pledge stocks which she owned as security for the obligation. Mrs. Bradley indicated her willingness to do this, but before the arrangement could be carried out, the bank was informed by its legal adviser that the Georgia law would make such a solution unacceptable to the bank. Mr. Bradley's attorney disagreed with the bank's legal adviser, as to the applicability of the Georgia statute to the situation, but suggested, in order to placate the bank, that Mrs. Bradley might be willing to give the stocks to some other person who would be under no such disability, and the bank agreed that, if the gift were absolute and unconditional, *172 they would then be satisfied to accept the securities. Mr. Bradley's attorney conveyed the suggestion to Mr. Bradley, advising him of the necessity that the gift be absolute and unrestricted, and suggested D. A. Turner as the most available donee. Turner was the husband of the only daughter of decedent, was a close business associate of his father-in-law, Mr. Bradley, and was regarded by Mr. and Mrs. Bradley with warm affection and complete confidence. Mr. Bradley talked the matter over with Mrs. Bradley, who readily agreed to make the gift. Pursuant to her suggestion, the certificates were secured from the safe deposit box, and, on the day of the transfer, Mr. Bradley sent his private secretary, who was a notary public, out to the Bradley home for the purpose of witnessing her signatures. After assuring the notary that she understood the conclusive legal effect of the transfer, she signed the certificates in his presence, and he immediately returned with them to the office, and during the same day delivered them to Mr. Turner. Mr. Turner took the necessary steps to have the stock transferred on the books of the several corporations, and, when that had been done, sent them immediately *173 to the National City Bank to be used as collateral to secure Mr. Bradley's loans. The certificates remained in the hands of the National City Bank until November, 1936, when they were released by the bank, and returned, at Turner's authorization, with other stocks, to Mr. Bradley, who delivered them to Turner. Turner placed them in his safe deposit box the following morning, and they were thereafter in Turner's possession. During the period after May 1932, while the certificates were in New York and thereafter, all dividends paid on the stock which they represented were paid to Turner, and totaled in the aggregate about $102,455.15. The sums so received were reported in the years received in Turner's income tax returns, and taxes thereon were paid by Turner. He used the money for the payment of certain of his own debts, and for investments, and for his own uses generally. There was no agreement or understanding of any kind as to the use which was to be made of the dividends. Mrs. Bradley intended to give Turner the stock unconditionally at the time the transfer was made, and Turner considered and treated and the securities and the dividends later received as his own property. Mrs. *174 Bradley had been for many years a woman of rather frail health but suffering from no immediately dangerous disease or condition. For about twelve years before her death, she employed a nurse-companion who also acted as housekeeper. This she did largely because of Mr. Bradley's frequent absences from home on extended business trips, and in order to relieve herself of the details incident to the management of a large establishment. She had tripped over a rug in 1926 and injured her arm, and fell again in 1929 and injured her knee. Because she feared the injured knee might fail to support her and cause her to fall again, she habitually carried a cane or crutch thereafter. She was otherwise in much the same condition as she had been during the greater part of her life. She lived a moderately active life, was cheerful, and entertained extensively throughout her life. She played cards almost every evening, and was greatly interested and active in certain charitable enterprises. She was extremely fond of her three grandchildren, and spent a great deal of time and effort entertaining them. She was occasionally treated by her physician for various minor ailments, and for a moderate degree *175 of hypertension and arteriosclerosis and a slight valvular heart condition of thirty or forty years standing, but her condition was not unusual for a person of her age, and she never expressed any apprehension or thought of death. She continued to lead her reasonably active life until 1935 or 1936, during which years she suffered some convulsive seizures or attacks, the last of which, about six weeks before her death, was the only one which caused any alarm. She was confined to her bed as a result of that attack for about six weeks, and her death was the immediate result of pneumonia. Her physician believed she would have survived the attack if prnumonia had not developed. The transfer of the stock in 1932 was not made by decedent in contemplation of death, nor intended to take effect in possession or enjoyment at or after her death. Decedent did not retain for her life, or for any period not ending before her death, the possession or enjoying of or the income from the property or the right to designate anyone who should possess or enjoy the property or the income therefrom. The transfer was a completed gift in 1932, and the stocks which constituted the gift were not properly includable *176 in decedent's gross estate under section 302 of the Revenue Act of 1936 as amended. ISSUE NO. 3. Funeral expenses, in an amount of $2,201.21 were paid by the petitioners, with the approval of the Probate Court which had jurisdiction of the estate. The will of the decedent provided that "As soon as practicable after my death, I direct that my Executors and Executrix, hereinafter named, shall pay all of my just debts," and "I direct that a marble slab shall be erected over my grave suitable to my station in life." The statutes of the State of Georgia provide, with reference to the estates of decedents: "All the estate, real and personal, unless otherwise provided by this Code, shall be liable for the payment of debts * * *." Sec. 113-1509, Georgia Statutes Ann. 1933 Ed. and, in the same chapter: "Claims against the estates of decedent shall rank in the following order.. 1. Year's support for the family; 2. Funeral expenses to correspond with the circumstances of the deceased in life, including the physician's bill and expenses of the last sickness * * *." Sec. 113-1509, supra. ISSUE NO. 4. The parties hereto have stipulated that reasonable attorneys' fees and other *177 expenses which shall have been incurred as the result of these proceedings shall, subject to the approval of the Court, be in the first instance determined under Rule 50, and, secondly, in any hearing pursuant to mandate; that upon a decision having been promulgated by the Court, the petitioners shall forthwith pay or agree to pay all attorneys' fees and other expenses then incurred, and shall furnish the respondent with an affidavit setting forth the details and amounts thereof. Opinion KERN, Judge: ISSUE NO. 1. In connection with the valuation of the stock of the W. C. Bradley Co. owned by decedent at the time of her death, the petitioners rely almost wholly on the capitalization of earnings theory, while the respondent urges that the chief factor must be the replacement cost of the underlying assets, which he assumes to be the market value of those assets on the date of decedent's death. Each side to this litigation, of course, insists that its theory contemplates and gives due weight to all the necessary and proper factors. In our opinion neither does so. We have heretofore approved and applied the regulations of the Treasury Department with respect to the value of shares *178 of stock in a closed corporation on the basis of the company's net worth, its earnings and income capacity, and all other factors having a bearing on the value of the stock. . We have found the facts required by the regulation, and such others as we consider relevant and material, and have given due and careful attention each of them. We have considered the stipulated facts, the testimony of all the witnesses, expert and others, and all the other evidence bearing on this question, and we have arrived at the conclusion that the fair market value of the 1.563 shares of the common stock of the W. C. Bradley Co. at the time of decedent's death was $429,825, or $275 per share. ISSUE NO. 2. The next issue concerns the inclusion in decedent's gross estate of the value of 1,250 shares of Coca Cola common stock and 5,000 shares of Bibb Manufacturing Co. stock, which were transferred by decedent in May 1932 to her son-in-law, D. A. Turner, for the primary purpose of enabling him to use the stock as security for the payment of certain obligations of decedent's husband. The petitioners urge the transfer was an outright gift, *179 while the respondent urges, first, that it was not intended as a gift; second, that decedent did not surrender her control over the stock; and third, that if it were intended as a gift, it was ineffective because it was made for an illegal and prohibited purpose; and, though respondent does not contend very vigorously for it, he has also raised the point that the transfer was made in contemplation of death. The evidence concerning the transfer and the circumstances surrounding it are clear, positive, credible and uncontradicted. The only question is as to its legal effect. There can be no doubt that Mrs. Bradley had the power to make a legal gift of her separate property. In fact, the evidence shows that she made several other substantial gifts, one of $75,000 at about the same time as this transfer, and the respondent has not questioned their legality nor attempted to include them in her estate. There was nothing illegal in her motive for making the gift. Had she pledged her stock as collateral security for her husband's debt, the pledge would not have been void under the laws of Georgia, but voidable at her instance, and for that reason the bank was unwilling to accept it as *180 long as it was her property. There was no law which prevented her from making a bona fide gift of the property, and she had been advised that the efficacy of the transfer to accomplish its primary purpose depended upon the conclusiveness of her gift. We can not find any evidence that she retained, either expressly or impliedly, any power whatever over the stock, or any interest in it. The evidence shows, on the contrary, that she never thereafter regarded herself as having any interest in it. Dividends were paid to Turner, who used them for his own purpose and paid taxes on them. When the stock was released on November 1936 it was immediately delivered to Turner who placed it in his safe deposit box, where it has since remained. The respondent argues that the transfer was revocable by operation of law, regardless of the donor's failure to retain any express interest in or control over the property. His contention, with respect to this issue, is that, under the Georgia law, the gift of the stock by Mrs. Bradley to her son-in-law, for the purposes indicated, was in reality, a transfer of her property as collateral security for a debt of her husband, and as such was revocable by *181 her; that its avoidance was a right personal to her and coextensive with her lifetime; and that, therefore, the property with respect to which such revocation could have been exercised to the moment of her death, was imperfectly transferred and thus properly includible in her estate. We think respondent's interpretation of the Georgia law is unjustifiably broad. The statute which gives rise to this contention is not as restrictive upon the powers of married women as respondent has indicated. The Supreme Court of Georgia has had occasion to clarify the subject on many occasions, and the rule seems now to be well established, as expressed in Hawkins v. Kimbrell et ab, : The meaning of the rule is, that, if the gift is not induced by fraud or duress upon the part of the donee or creditor, and is intended to be an absolute gift of the property, it will be valid and binding upon the wife, not withstanding that the purpose for which it was made was to enable the son or husband to secure his debt, but that it will not be valid and binding if the gift was intended to be only for the occasion, and the property to be *182 returned to the donor after the debt had been satisfied. And, later, in 1937, the same Court said, in , where a wife had given property to her husband: She says her motive was to make it subject to his debts. She had a right to do so and it was legal for her to make such conveyance. Her motive is immaterial. The wife may give property to her husband so that he may use it to pay his debts. * * * Having made a gift of the property to her husband, she could not thereafter repudiate it, and claim her property, when levied upon, contrary to her deed. And, in 1942, the Court reiterated the substance of the rule in S.E. (2) 919: It is by no means true that she is forbidden to utilize her estate for her husband's benefit. She may make an outright gift of the property to him, without receiving in return any advantage to herself. We have found as a fact that decedent intended to and did make an outright and absolute gift of the property here involved. After careful consideration of the Georgia *183 statute, and the construction given it by the Supreme Court of Georgia, we are unable to agree with the respondent's contention that such a gift was thereafter and until decedent's death revocable by operation of law. Therefore, the respondent's argument upon this point must fail, because it is predicated upon the proposition that the transfer in question was voidable by decedent under the law of Georgia. The respondent also feels that, since decedent could probably have secured a return of the stock to her, had she lived, simply by requesting it, we should find she had never relinquished her control over it. While the decedent might have been able to depend on the reciprocal generosity of her son-in-law to secure a return of the stock, she certainly had no legal right to its return. A completed gift, once made, can not be revoked. Moreover, we can find no reasonable basis for believing she would have requested the return of the stock. Her conduct, during the four and one-half years of her life after the transfer was made, was in strict accordance with the legal consequences of her act and the validity of the gift. We are unable to impute to her any lack of bona fides in the *184 transactions, since there is no evidence to support such an imputation. We believe she intended to, and did, make an absolute and legal gift of the stock to her son-in-law in 1932. The Commissioner erred in including it in her gross estate. ISSUE NO. 3 On the question whether the funeral expenses of decedent are properly deductible from the gross estate, the statutes of Georgia provide that decedents' estates are liable for the payment of debts, and funeral expenses are second in the order in which debts are to be paid. The decedent's will provided that her executors should pay "all of my just debts," and that "a marble slab shall be erected over my grave suitable to my station in life." The petitioners paid, with the approval of the Probate Court having jurisdiction of the estate, the total sum of $2,200.21 for the funeral expenses of the decedent, which amount included a marble slab over the grave. Section 303 (a) (1) of the Revenue Act of 1926, as amended, provides that the value of the net estate of citizen or resident of the United States shall be determined by deducting from the value of the gross estate such amounts: (A) for funeral expenses * * * as are allowed by *185 the laws of the jurisdiction * * * under which the estate is being administered. * * * Article 31 of Regulations 80 reads: ART. 31. Funeral expenses. An executor may deduct such amounts for funeral expenses as are actually expended by him and, under the laws of the local jurisdiction, are payable out of the decedent's estate. A reasonable expenditure by the executor for a tombstone, monument, mausoleum, or for a burial lot, either for the decedent or his family, may be deducted under this heading, provided such an expenditure is allowable by the local law. Respondent argues in the instant case that since the husband is liable for the support of his wife under Georgia law, he is primarily liable for the payment of her funeral expenses. However, regardless of whether the estate of the decedent was primarily or secondarily liable for the payment of these expenses, it is a fact that they were actually expended by the executors and the expenditures were approved by the State Court having jurisdiction. The deduction should have been allowed. . ISSUE NO. 4. The parties have agreed that the issue relating to *186 the amount of the attorneys' fees and expenses shall be determined under Rule 50. That question is therefore not necessary to decide here, but is left for later determination in accordance with the stipulation. Judgment will be entered under Rule 50.